**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DOMINIC MUSARRA,** *et al.* | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. C2-05-545** |
| | : | |
| **v.** | : | **JUDGE ALGENON MARBLEY** |
| | : | |
| **DIGITAL DISH, INC.,** | : | **Magistrate Judge King** |
| | : | |
| **Defendant.** | : | |

<u>**OPINION AND ORDER**</u>

## I. INTRODUCTION

This matter comes before the Court on the parties' cross-motions for partial summary judgment.[1]  On February 24, 2006, Plaintiffs moved this Court for partial summary judgment as to the applicability of the Motor Carrier Exemption to Plaintiffs.  On the same day, Defendant, Digital Dish, moved for summary judgment on the same issue.  For the reasons set forth herein, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment and **GRANTS** Defendant's Motion for Partial Summary Judgment.

## II. STATEMENT OF FACTS

### A. Background

#### 1. Digital Dish

Defendant Digital Dish ("Defendant" or "Digital Dish") is a privately-held, family-owned corporation whose primary purpose is to act as the Ohio Regional Service Provider ("RSP") for its

---

[1]Though labeled as a "Motion for Summary Judgment," as per the parties' agreement set forth in the October 18, 2005 Preliminary Pretrial Order, Defendant's Motion is a motion for *partial* summary judgment limited to the issue of the applicability of the Motor Carrier Exemption to Plaintiffs' FLSA claims.

parent company, DISH Network.[2]  Digital Dish possesses an exclusive license to deliver and install DISH Network equipment, which consists primarily of satellite dishes and receivers, in an area encompassing Ohio, and portions of Kentucky, Indiana, and West Virginia.

Each of the three named plaintiffs, Dominic Musarra ("Musarra"), Kevin Klug ("Klug") and Charles Everett, Jr. ("Everett") (collectively "Plaintiffs"), worked for Digital Dish as a "satellite technician"[3] (hereinafter "technician") during the time period between June 2003 through December 2004.  During that time period, Digital Dish employed approximately 300 such delivery and installation technicians.  Technicians have a myriad of duties, and their primary responsibilities consist of building, installing, repairing, and removing digital satellite equipment for DISH Network customers.

Digital Dish receives all of the goods that its technicians deliver, install, and service from out of state.  DISH Network ships the goods via freight primarily from its facilities in Illinois, to pass onto its customers.[4]  DISH Network sends Digital Dish at least one or two tractor trailers of equipment each day.  All incoming equipment goes to the Digital Dish distribution center in Millersburg, Ohio, and from there, is distributed to one of Digital Dish's thirteen Ohio warehouses. To determine the amount of product to ship to Digital Dish each day, DISH Network uses a formula based on the current needs of DISH Network customers in Digital Dish's geographic area.  DISH

---

[2]DISH Network is a part of EchoStar Satellite LLC.  Headquartered in Englewood, Colorado, EchoStar Communications Corporation is a public company with approximately 20,000 employees.  *See* EchoStar Company Profile, available at, http://www.dishnetwork.com/content/aboutus/company_profile/index.shtml (last viewed Aug. 3, 2006).

[3]Defendant also refers to "satellite technicians" as "job technicians."

[4]DISH Network also ships some goods from facilities in Colorado, Georgia, and Tennessee.

Network extends a "credit limit" reflecting the amount of equipment that Digital Dish may receive per week, based on the number of customer jobs in queue – in other words, on the number of customers in Digital Dish's area of coverage who *actually* ordered product, made trouble calls, or requested changes and/or upgrades.

Digital Dish earns the most "credit" for each new connection currently in the job queue, and these "new connects" account for the largest part of the "credit limit" of shipped goods. Digital Dish receives a lesser "credit" for each pending trouble call in its area and for each pending customer "change or upgrade." To translate these "credits" into projected inventory requirements, DISH Network adds the above three "credit" categories together, doubles the result to account for inventory still in transit, and then multiplies by eighty percent. DISH Network then compares this "total credit" to Digital Dish's current credit balance, re-evaluating the need for a higher credit limit when and if the numbers reveal an increase in customer installation or service activity. The amount of "credit" DISH Network extends to Digital Dish changes constantly, rising and falling according to customer demand.

After the DISH Network equipment arrives at Digital Dish's Millersburg distribution center, Digital Dish employees break it down and sort it by warehouse. Receivers and dishes arrive on pallets. Receivers come in their own individual box on pallets that contain 50 to 70 boxes, depending on the model size. Each pallet is wrapped entirely in plastic, which must be removed when the warehouse workers break the pallets down. The warehouse workers scan each piece of equipment and determine which of the Digital Dish warehouses will receive it. Digital Dish maintains three tractor-trailers to deliver equipment from the Millersburg, Ohio distribution facility

to its other Ohio warehouses.[5]

DISH Network maintains tight control over the equipment it ships to Digital Dish, shipping only on a consignment basis, and retaining title to its equipment until it is delivered to customers. In order to determine how long an individual piece of equipment sits in Digital Dish's warehouse, DISH Network also uses a tracking system based on the serial numbers of its equipment. Although DISH Network attaches a serial number to each piece of equipment it sends to Digital Dish, Digital Dish has its own tracking system as well. Pursuant to the Digital Dish system, Digital Dish assigns a second serial number to all incoming equipment before preparing it for distribution. DISH Network requires that Digital Dish retain equipment in its distribution centers for fewer than ten days before passing it onto DISH Network customers, and the equipment is usually transported to customers within three to four days.

### 2. Sales Referrals

In general, a DISH Network customer who wants to purchase DISH Network equipment contacts DISH Network directly either by phone or through the Internet. Digital Dish concedes, however, that approximately 0.5% of its monthly installations arise from Digital Dish referrals rather than from customers' direct contact with DISH Network.

Digital Dish employs one "salesperson" at its Millersburg, Ohio distribution center.

---

[5]Digital Dish provides 90 percent of the approximately 300 technicians a pickup truck with caps that weighs under 10,000 pounds. The trucks do not have seating capacity for eight people and do not transport hazardous waste. The trucks have the DISH Network logo and Digital Dish's phone number on their sides. The technicians do not have to have a Commercial Driver's License ("CDL") and do not have to maintain DOT logs. Technicians load their own trucks at the nearest Digital Dish warehouse.

Customers can contact that salesperson by phone or by walking into the Millersburg facility.[6]  There is no counter service for walk-in customers, but there are signs erected in the Digital Dish office that read, "Ask About Dish Network Service."  If a person inquires about DISH Network, he or she is not guaranteed to become a DISH Network customer.  If a person makes an inquiry, the Digital Dish salesperson contacts DISH Network who subsequently processes the person's information through its system to determine whether to "accept" him as a new customer.[7]  If DISH Network approves the customer, the customer's referral is processed as a standard DISH Network order.

After installation on a sales referral is complete, DISH Network considers the referral "successful" and the referring salesperson receives a $5.00 commission.  Technicians can also make sales referrals.  If a technician refers a new customer to Digital Dish to purchase DISH Network equipment, once that customer has been approved and the DISH Network equipment has been successfully installed, the technician receives a $30.00 commission on the sale.  Aside from these commissions, all money from Digital Dish sales referrals goes directly to DISH Network.

### 3. DISH Network's Distribution of Work Orders to Digital Dish

DISH Network distributes work orders to Digital Dish based on the application of a complex formula which works on a "point system."  Essentially, each Digital Dish technician who works in a particular geographic area represents a number of available "work points,"

---

[6]According to the deposition testimony of January Bowles, the Digital Dish salesperson during the putative class period, there were an average of seven referrals a day by phone. Bowles Dep. at 55:19-22.  Also, during the putative class period, new customers walked in "off the street" for a referral only once every three to four months.  *Id*. at 54:23-25.

[7]According to January Bowles, when she was employed as the salesperson, about 2 out of every 7 customers who called Digital Dish to request DISH Network service failed to qualify as acceptable DISH Network customers.  *See* Bowles Dep. at 57:5-14.  This constitutes a fail rate of approximately 62 percent.

depending on his background, experience, skill set, and availability.  Digital Dish maintains a computer system to which DISH Network has access, which allows DISH Network to assess the amount of "points" Digital Dish has available in any give geographic area within its assigned region.  When DISH Network receives a customer order, it examines the number of  "points" available in that customer's geographic region, and if Digital Dish has sufficient points, DISH Network will forward the customer's order to Digital Dish, which will then assign the order to a specific Digital Dish technician.  Each day, Digital Dish e-mails the upcoming DISH Network orders to its technicians, assigning orders based on each technician's geographic proximity to the customers.

### 4. Daily Tasks of a Technician

Technicians typically receive their next day's work orders in the evening and pre-call customers to schedule service appointments in advance.  The Digital Dish warehouses open at approximately 7:00 a.m each day.  When a technician arrives at one of Digital Dish's warehouses in the morning,[8] he picks up the DISH Network equipment necessary to complete his day's assigned work orders.  Technicians also pick up consumable supplies from the warehouses, such as nuts, bolts, cable, and poles, much of which are shipped to Digital Dish by DISH Network.[9]  Prior to leaving the Digital Dish warehouse, technicians generally attach the mounting structure, arms, and

---

[8]Technicians typically arrive at the Digital Dish warehouses around 6:30 a.m., and depending on their arrival time, the loading process usually takes them anywhere from one to three hours to complete. Complaint ¶ 20.

[9]All consumable supplies except the nuts and the bolts which are not included with satellite dishes are shipped to Digital Dish from DISH Network based on the same "present need" formula used to determine the amount of equipment to ship each day.  *See* Schneider Aff. ¶ 20; Anderson Aff. ¶ 15.

certain low-noise block feedhorns[10] to satellite dishes to make more space in their trucks.  Further,

technicians often spend fifteen to twenty minutes downloading the necessary programs onto the

receivers set for delivery, so they can save time once they arrive at a customer's home.[11]

The warehouse worker scans all outgoing receivers and dishes, noting the DISH Network

and Digital Dish serial numbers and the corresponding technician who took possession of the

equipment.  The worker also collects signed paperwork indicating that the technician actually

received the equipment.  The individual receivers and dishes are not assigned to a technician based

on any specifically identified customer; each technician decides what receivers he needs based on

his day's work orders.  Technicians also pull equipment in advance, and store it in their truck to use

in subsequent service calls or, on occasion, to trade with other technicians.[12]

With the equipment in hand, each technician then sets out to complete his day's schedule.

In general, a technician's primary task is the delivery and installation of DISH Network equipment,

but technicians also do repairs, upgrades, and returns.  Each technician completes approximately two

---

[10]A low-noise block feedhorn ("LNFB") is an "electronic eye designed to capture the signal from the surface of a satellite dish and feed it, by cable, to a receiver, from whence it is transmitted to a television for viewing."  *See* Schneider Af.. ¶ 25; Klug Dep. at 57-62.

[11]Klug testified that he performed 65 to 75 percent of his advanced preparations of DISH Network equipment either at his own home or at the warehouse, and the remaining 25 to 35 percent of these preparations at customer homes.  Klug Dep. 17, 27-29.  Further, Klug and Musarra both testified that they took the first step in activating about 33 percent of all DISH Network receivers earmarked for customer delivery prior to delivery and installation by unpacking them, connecting them to a satellite dish, and "downloading" updated software from DISH Network.  *See* Klug Dep. at 27-29; Musarra Dep. at 46-50.

[12]Musarra testified that technicians exchanged equipment "very often."  *See* Musarra Dep. at 64:10-65:2.  Klug testified that "[s]ometimes to avoid going to the warehouse, if I needed just one or two [satellite dishes], and another technician that was working in my area had one or two extra on their truck, I would get it from them off of their truck.  And then the next time I went to the warehouse, I would get additional ones in order to give that to them to replace it on their truck. . . ."  *See* Klug Dep. at 20:11-22.

to three installations per day.  When installing satellites and receivers, a technician must mount a dish on the outside of the customer's home and then activate the customer's satellite service.  The process depends on the serial number on the customer's receiver which validates his or her satellite service, confirms his or her account with DISH Network, and acts as a tracking number so that DISH Network can establish that the customer is in good standing.  Once the equipment is installed, the DISH Network serial number is linked to the particular customer and can only be changed by a call from a technician to DISH Network reporting a problem.

After the technician completes a service call, he secures the customer's approval on a DISH Network Customer Service Agreement and (in the case of satellite receiver equipment installations) activates the customer's satellite subscription by contacting DISH Network.  Only DISH Network can activate service.

### 5. Returns and Exchanges

Returns, exchanges, and other servicing of DISH Network products are typically initiated by customers who call DISH Network to report equipment problems and/or a desire to secure an equipment upgrade.  Returns can occur in a number of situations, including faulty receivers, upgraded receivers, and incorrectly installed receivers.  After a customer makes his initial request for a return to DISH Network, a Digital Dish technician travels to the customer's home to determine what is wrong with the system.[13]  If there is an equipment-related problem, Digital Dish notifies DISH Network, who then draws up a work order which Digital Dish subsequently assigns to a technician within the closest geographic area.  Throughout each day, technicians  intersperse their

---

[13]If a Digital Dish technician determines that a customer's service problem is unrelated to DISH Network equipment, i.e., a broken television, but the customer still asks the technician to fix the problem, the technician charges $59.00 per hour.  *See* Schneider Dep. at 80:1-81:6.  All of the money goes directly to DISH Network.

installations and deliveries with any assigned returns and/or exchanges.

If a customer's equipment is broken, technicians retrieve it and return it to their home Digital Dish facility.[14] If, however, a customer requests a dish upgrade, technicians often use that customer's old dish for a new customer.[15] Warehouse employees then package and label some of the returns for shipping to DISH Network's out-of-state facilities.[16] For each such return, Digital Dish receives an addition to its "credit limit" from DISH Network.

## B. Procedural History

On June 3, 2005, Plaintiffs filed a complaint against Digital Dish (the "Complaint") alleging that the company's system of compensation violated 29 U.S.C. §§ 206(a) and 207(a) of the Fair Labor Standards Act ("FLSA"), as well as various provisions of the Ohio Minimum Fair Wages Standards Act ("OMFWSA"), Ohio Rev Code. §§ 4111, *et seq.* Complaint ¶¶ 80-87. Plaintiffs seek declaratory, injunctive and monetary relief in connection with Digital Dish's alleged wrongful denial of overtime compensation for technicians. *Id.* at 15.

---

[14]Musarra explained that technicians had one week to complete their returns, and he would do his returns "all at one time," bringing the equipment into the warehouse, "stacked, unpackaged, just throw it on the counter with the RA slip, and it was out of my hands." Musarra Dep. at 119:22-24.

[15]Klug testified,

[a] lot of times we would take . . . a Dish 500 off someone's house, or out of their yard in order to install a Super Dish. That Dish 500, we were instructed to use at another person's house, so we would take it from one house to another house in order to save the company money, so we are not using a new dish. . . We would have to modify the dish that we took off the house in order to fit with new components or new switches or new boxes that were being used by the company.

Klug Dep. at 18:7-24.

[16]DISH Network has out-of-state facilities in Texas, Illinois, Colorado, Georgia, and Tennessee. *See* Schneider Aff. ¶ 12

On October 18, 2005, the parties agreed to limit initial discovery and proceedings to the issue of whether the Motor Carrier Act ("MCA") exemption, 29 U.S.C. § 213(b)(1), applies to liability for overtime compensation under the FLSA.  On February 17, 2006, the Court entered a stipulated protective order to protect certain knowledge obtained during discovery that contained confidential or proprietary information concerning Defendant or other businesses or customer information.  The parties completed discovery and, on February 24, 2006, filed cross motions for summary judgment limited to the issue of the applicability of the MCA exemption.

### III. STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).  In response, the non-moving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993) (citations omitted).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The Court also must interpret all reasonable inferences in the non-movant's favor.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530

U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the non-moving party and must refrain from making credibility determinations or weighing the evidence). The existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; however, there must be evidence from which the jury reasonably could find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (finding summary judgment appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

Finally, when parties file cross-motions for summary judgment, "the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist."  *Parks v. LaFace Records*, 329 F.3d 437, 444-45 (6th Cir. 2003) (quoting *B.F. Goodrich Co. v. United States Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001)).

## IV. ANALYSIS

### A. Background - the FLSA and the MCA

The FLSA provides that any employee who "is engaged in commerce or in the production of goods for commerce" shall be paid a minimum of "one and one-half times the regular rate at which he is employed for every hour over forty hours he works in a workweek. 29 U.S.C. § 207.  But, under the MCA exemption, the FLSA exempts from its overtime pay requirement any employee subject to the Secretary of Transportation's power to establish qualifications and maximum hours of service "pursuant to the provisions of § 204 of the [MCA] of 1934." *Id.* §

-11-

213(b)(1).[17, 18]

The MCA exemption applies to employees for whom the Secretary of Transportation may prescribe requirements for qualifications and maximum hours of service under the Motor Carrier Act, 49 U.S.C. § 31502. 29 U.S.C. § 213(b)(1) (2004). According to 49 U.S.C. § 31502, the MCA exemption applies to transportation set forth in 49 U.S.C. §§ 13501 and 13502, which provide that the Secretary of Transportation may prescribe requirements for qualifications and maximum hours of service for "motor carriers" and for "motor private carriers," "when needed to promote the safety of operations." *See* 49 U.S.C. § 31502(b). A "motor carrier" is a "person providing commercial motor vehicle (as defined in section 31132) transportation for compensation." 49 U.S.C. § 13102(14). A "commercial motor vehicle" is:

> a self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle –
> (A) has a gross vehicle weight of at least 10,001 pounds, whichever is greater;
> (B) is designed or used to transport more than 8 passengers (including the driver) for compensation;
> (C) is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or
> (D) is used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of this title and transported in a quantity requiring

---

[17]Section 213(b)(1) states that:

The provisions of section 207 of this title shall not apply with respect to –
(1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49 . . .

29 U.S.C. § 213(b)(1).

[18]In 1966, Congress passed the Department of Transportation Act, effective on April 1, 1967, which transferred to the Department of Transportation ("DOT") "all functions, powers, and duties of the Interstate Commerce Commission [("ICC")]" with regards to the hours and safety provisions of the MCA. Exec. Order 11,340 (Mar. 30, 1967), pursuant to P.L. 89-670, sec. 15, 80 Stat. 950.

placarding under regulations prescribed by the Secretary under section 5103.

*See* 49 U.S.C. § 31132(1).  It is undisputed that the trucks driven by Digital Dish technicians are not "commercial motor vehicles."  Accordingly, Plaintiffs are *not* "motor carriers."

Therefore, the question becomes whether Plaintiffs are "motor private carriers."  A "motor private carrier" is:

> a person, other than a motor carrier, transporting property by *commercial motor vehicle*[19] (as defined in section 31122) when:
> (A) the transportation is as provided in section 13501 of this title;
> (B) the person is the owner, lessee, or bailee of the property being transported; and
> (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C. § 13102(15) (emphasis added).  49 U.S.C. § 13501(1), which governs the Secretary of Transportation's jurisdiction under the MCA, provides:

> The Secretary and the Board have jurisdiction, as specified in this part, over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier –

---

[19]On August 10, 2005, after Plaintiffs had left Digital Dish, Congress passed and President Bush signed SAFETEA-LU ("the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users"), an appropriations bill that amends The Federal Aid – Highways Act and creates set-asides for road constructions, public safety education programs, and the like.  SAFETEA-LU called for the addition of the word "commercial" before "motor vehicles" in the definition of "motor private carrier," requiring entities wishing to qualify as "motor private carriers" after August 10, 2005 to conduct business in vehicles weighing over 10,000 pounds or to transport hazardous materials.  *See* 49 U.S.C. § 31332(1) ("commercial motor vehicle").

Before August 10, 2005, the FLSA's MCA exemption applied to most employees who drove any type and size of motor vehicle in interstate commerce.  After the passage of SAFETEA-LU, however, vehicles that were previously exempt under the old definition of "motor vehicle" are no longer exempt because they are not "commercial motor vehicles."  *See* Felhaber, Larson, Felon, Vogt, P.A., *Big Changes in Exempt Status for Drivers and Mortgage Loan Officers*, 16 No. 4 Minn. Emp. L. Letter 2, at *2 (June 2006).  The DOL has not commented on the changes, and [has not] changed its website to reflect them.  It [is not] clear that the department even knew about the changes when they took place or that Congress actually intended that they affect the FLSA."  *Id*.  The parties disagree about whether SAFETEA-LU is a factor in their dispute.  *See supra*, Part IV.B.2.

-13-

(1) between a place in–
    (A) a State and a place in another State;
    (B) a State and another place in the same State through another State;
    (C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;
    (D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or
    (E) the United States and a place in a foreign country to the extent the transportation is in the United States. . .

*See* 49 U.S.C. § 13501 ("General jurisdiction").

## B. Statutory Interpretation

### 1. Interpreting the Jurisdiction of the Secretary of Labor Under 49 U.S.C. § 31502

Before this Court can consider whether Plaintiffs qualify as "motor private carriers" covered by the MCA exemption, it must consider Plaintiffs' argument that 49 U.S.C. § 31502 applies to "motor carriers" only.  49 U.S.C. § 31502(b) states that the Department of Labor ("DOL") has the power to regulate the hours worked of both "motor carriers" *and*, when necessary, "motor private carriers."  *See* 49 U.S.C. § 31502(b) ("Motor carrier and private motor carrier requirements").  49 U.S.C. § 31502(a) provides that the section applies to transportation described in sections 13501 and 13502[20] of title 49; however, section 13501 states that "[t]he Secretary and the Board have jurisdiction . . . over transportation by *motor carrier* and the procurement of that transportation, to the extent that passengers, property, or both, are transported by *motor carrier*." 49 U.S.C. § 13501 (emphasis added).  According to Plaintiffs, because the plain language of section 13501 limits its description of interstate transportation to "motor carriers," Congress did not intend the MCA exemption to apply to "motor private carriers."

---

[20]49 U.S.C. § 13502 relates to transportation that occurs between Alaska and other states, and, therefore, is irrelevant to this Court's analysis of whether the MCA exemption applies to both motor carriers and motor private carriers.  *See* 49 U.S.C. § 13502 ("Exempt transportation between Alaska and other States").

In *Friedrich v. U.S. Computer Servs.*, the Third Circuit rejected an identical argument by plaintiffs asserting claims for overtime pay under the FLSA. *See* 974 F.2d 409, 412-13 (3d Cir. 1992). The *Friedrich* court explained that although sections 13501 and 13502[21] "speak only of 'motor carriers,' which are later defined as motor common carriers and motor contract carriers, 49 U.S.C. § 10102(13)," "section 3102(a)(1) simply refers to sections 10521 and 10522 for a description of the type of transportation subject to the DOT's jurisdiction, that is interstate transportation," and the plaintiffs' proffered interpretation would "render section 3102(b)(2) meaningless." *See id*. at 413.

Moreover, in dicta, other courts, including the Sixth Circuit Court of Appeals, have interpreted section 31502(b)(2) as vesting the Secretary of Transportation with the authority to regulate the hours for employees who work for "motor private carriers" when necessary to "promote safety of operation." *See Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 904 (6th Cir. 2002) (citing 49 U.S.C. § 31502(b)(2) as "providing that the Secretary of Transportation has the power to specify the maximum number of hours for employees who work for private motor carriers[22] when needed to promote safety of operation"); *see also Ballou v. DET Distrib.* Co., 2006 WL 2035729, at *11 (M.D. Tenn. July 17, 2006) (same); *Harrington v. Despatch Inds., L.P.*, 2005 U.S. Dist. LEXIS 12781, at *12 (D. Mass. June 29, 2005) ("Under the MCA, the Secretary of Transportation is authorized to prescribe "qualifications and maximum hours of service of employees of and standards of equipment of, a ['] motor private carrier,['] when needed to promote safety of operation.

---

[21]*Friedrich* refers to sections 10521 and 10522, which have since been recodified as 49 U.S.C. §§ 13501 and 13502.

[22]On occasion, courts refer to "motor private carriers" as "private motor carriers." *See, e.g., Vaughn*, 291 F.3d at 904.

49 U.S.C. § 31502(b)(2).").  Based on the reasoning in *Friedrich* as well as other courts' liberal interpretations of the statute, the Court finds unpersuasive Plaintiffs' literal reading of 49 U.S.C. § 31502(b)(2).  Thus, the Court holds that the statute provides the Secretary of Transportation with the power to regulate interstate transportation by both "motor carriers" and "motor private carriers."

## 2. Whether the SAFETEA-LU Amendment Applies

As set forth *supra*, the SAFETEA-LU Amendment, passed on August 10, 2005, altered the MCA exemption to eliminate drivers of all *non-commercial* motor vehicles from coverage. *See supra*, note 19.  The parties agree that Digital Dish technicians' trucks (if they have one) do not qualify as "commercial motor vehicles" under 49 U.S.C. § 31132(1).  *See supra*, Part IV.A. The parties disagree, however, as to whether SAFETEA-LU applies to the instant case. Plaintiffs concede that they were Digital Dish employees *before* SAFETEA-LU was passed. Plaintiffs argue, however, that employees who worked for Digital Dish *after* the enactment of SAFETEA-LU might later opt into the suit, expanding the proposed class to include both pre-SAFETEA-LU and post-SAFETEA-LU employees.  Defendants counter that Plaintiffs' argument fails because the Court cannot certify a class action in which the class representative is not a part of and/or similarly situated to the rest of the class.

As a threshold matter, the Court notes that retroactive application of SAFETEA-LU is highly disfavored.  *See Landgraf v. USA Film Prods.*, 411 U.S. 244, 280 (1994) ("If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result."); *Michigan Ass'n of Governmental Employees v. Michigan Dep't. of Corr.*, 992 F.2d 82, 84 (6th Cir. 1993) (noting that "the FLSA does not authorize retroactive rulemaking").  SAFETEA-LU does not include any language evincing

-16-

Congressional intent to apply the amendment retroactively, and such a finding would result in confusion and unfairness as various individuals who until August 10, 2005 were exempt. Further, because the parties moved for summary judgment solely on the issue of whether Plaintiffs fell under the MCA exemption while working for Defendant, at this stage of the litigation, the Court need not decide whether SAFETEA-LU is applicable to other putative class members who may later opt into the suit.[23]

### C. The MCA Exemption

### 1. The DOL's Stipulation of Dismissal in *Chao v. Digital Dish*

In 2004, the DOL, by way of the Secretary of Labor, Elaine L. Chao, sued Digital Dish, alleging that the company had violated federal wage and hour law, specifically section 207 of the FLSA by allegedly failing to pay overtime to certain Digital Dish employees. *Chao v. Digital Dish, Inc.,* Case No. 5:04-cv-01793 (hereinafter, "*Chao*"). On July 15, 2005, Digital Dish filed a Motion for Summary Judgment asserting that the MCA exemption nullified the FLSA claims at issue. On August 3, 3005, the DOL voluntarily dismissed the case, stating only:

> Plaintiff concludes that technicians employed by Defendant Digital Dish, Inc. are (and were, for all periods relevant to this case) exempt from the overtime requirements of the Fair Labor Standards Act under 29 U.S.C. [§] 213(b)(1). Therefore, pursuant to Rule 41(a)(1)(ii) of the Rules of Civil Procedure, the parties hereby agree that this matter be dismissed with prejudice, with the parties bearing their own costs.

*See Chao* Stipulation of Dismissal. In its Motion, Defendant asserts that the DOL's dismissal in *Chao* is entitled to significant judicial deference under *Chevron USA Inc. v. Natural Res. Defense Council, Inc.*, and suggests that this Court should rely on the *Chao* dismissal to dismiss this instant

---

[23]On August 30, 2006, the Court **DENIED** Plaintiffs' Motion to Supplement the Record with an affidavit and a declaration by two former Digital Dish technicians who worked for the company from March 2005 through 2006, after the enactment of SAFETEA-LU.

case.  *See* 467 U.S. 837 (1984).  At oral argument, however, counsel for Defendant conceded that though the DOL's decision should be given "a lot of weight," such weight does not amount to *Chevron* deference.  Plaintiffs counter that the *Chao* stipulation of dismissal is not entitled to substantial deference under *Chevron* because it does not amount to a legislative or quasi-legislative act.  Moreover, Plaintiffs note that the DOL's "decision to dismiss the case appears to have been motivated by the fact that the "[DOL] was itself a party to the case, as well as the author of various regulations and contradictory opinion letters."

Under *Chevron,* an agency's interpretation of a statutory provision is accorded deference "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation was promulgated in the exercise of that authority." *United States v. Mead Corp.,* 533 U.S. 218, 226-27 (2001) (interpreting *Chevron*, 467 U.S. at 837).  The Court finds *Chevron* inapplicable to the instant case.  *AOL Online, Inc. v. AT&T Corp.* is instructive on the issue.  243 F.3d 812 (4th Cir. 2001).  In *AOL*, plaintiff, AOL, sued defendant AT&T seeking preliminary and permanent injunctive relief for AT&T's alleged infringement of its trademarks. 243 F.3d at 812.  One of the trademarks at issue was AOL's "Buddy List" trademark.  *Id*. at 816.  "AOL's principal argument for the validity of 'Buddy List' as a 'suggestive' mark rested on the "significance of its having obtained a certificate of registration from the Patent and Trademark Office ("PTO")."  *Id*.  AOL argued that the district court erred in failing to give *Chevron* deference to the expert decision of the PTO to register the mark without requiring evidence of secondary meaning.  *Id*.  The Fourth Circuit disagreed, explaining that the PTO's decision, which amounted to a *quasi-adjudicatory action*, rather than relating to the PTO's statutory interpretation, related to principles "governed by administrative adjudications of mixed questions

-18-

of law and fact." *Id*. at 817 (emphasis added).  Accordingly, the *AOL* court held that the PTO's decision was not entitled to *Chevron* deference, and found instead that the PTO's determination "ought not be reversed if it was supported by substantial evidence." *Id*.

As in *AOL*, the DOL's stipulation of dismissal is more akin to a quasi-adjudicatory action than to a  legislative action.  The DOL's decision, rather than interpreting 29 U.S.C. § 213(b), applies the MCA exemption to *Chao* to determine whether it is applicable – a mixed question of law and fact.  Accordingly, as in *AOL*, the DOL's determination ought not be reversed if it was supported by "substantial evidence."  The DOL's stipulation of dismissal sets forth *no* evidence, let alone substantial evidence.  The reader is given no indication as to why the MCA exemption applies, just that it does.  Other courts to consider the applicability of the exemption have done so in detail.  *See, e.g., Friedrich*, 974 F.2d at 409,  *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670 (10th Cir. 1993); *Billings v. Rolling Frito-Lay Sales, LP*, 2006 U.S. Dist. LEXIS 4698 (D. Tex. Jan. 31, 2006).  Because there is no evidence to support the DOL's finding that the MCA exemption applies to Digital Dish technicians, the Court will consider the merits of the parties' arguments on the issue.

**2. Whether the MCA Exemption Applies to Plaintiffs**

Exemptions from the FLSA are narrowly construed against employers and are to be withheld except as to persons "plainly and unmistakably" within their terms and spirit.  *Auer v. Robbins*, 519 U.S. 452, 462 (1997); *Mitchell v. Kentucky Fin. Co.*, 359 U.S. 290, 295-96 (1959).  Moreover, the employer bears the burden of proving that the exemption applies to the employee in question.  *Douglas v. Argo-Tech. Corp.*, 113 F.3d 67, 60 (6th Cir. 1997).  Accordingly, in order to invoke the MCA exemption, Digital Dish must produce sufficient evidence to show that: (1) Digital Dish is a "motor private carrier"; (2) Plaintiffs were (or could have been) engaged in activities that

-19-

"affect the safe operation of motor vehicles on public highways"; and (3) Plaintiffs were (or could have been) called upon to transport goods in interstate commerce. *See* 49 U.S.C. § 31502 (defining the scope of the MCA exemption). Though the parties agree that Plaintiffs were engaged in activities that affect the safe operation of motor vehicles on public highways, they dispute whether Digital Dish is a "motor private carrier," and whether Plaintiffs transported goods in interstate commerce.

### a. Whether Digital Dish is a "Motor Private Carrier"

As noted above, before the enactment of SAFETEA-LU, a "motor private carrier" was defined as:

> a person, other than a motor carrier, transporting property by motor vehicle when --
> (A) the transportation is as provided in section 13501 of this title;
> (B) the person is the owner, lessee, or bailee of the property being transported; and
> (C) the property is being transported for sale, lease, rent or bailment or to further a commercial enterprise.

*See* 49 U.S.C. § 31502(b)(2). Digital Dish is a "person . . . transporting property by motor vehicle." *Id*. Digital Dish is the "bailee of the property being transported"[24] and "the property is being transported for sale . . . or to further a commercial enterprise." *See id*. Thus, Digital Dish meets the requirements of a "motor private carrier" if, as set forth in 49 U.S.C. § 13501, it transports DISH Network goods in interstate commerce.

It is undisputed that Digital Dish technicians performed their deliveries and installations solely within the state of Ohio; however, the Supreme Court has held that transportation within a single state may remain "interstate" in character when it forms a part of a "practical continuity of

---

[24]As noted above, DISH Network ships all its equipment on consignment. Thus, Digital Dish is a bailee of the equipment until a technician installs it in a customer's home, at which point, the customer owns the equipment.

-20-

movement" across state lines from the point of origin to the point of destination.  *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943).[25]  The characterization of such transportation as interstate or intrastate depends upon the "essential character of the shipment."  *Texas N.O.R.R. v. Sabine Tram Co.*, 227 U.S. 111 (1913).[26]  Moreover, a crucial factor in determining the character

---

[25]The Court envisioned three circumstances when goods were brought from out of state but sold and distributed to customers within the state: (1) goods purchased by the wholesaler or distributor upon order of a customer with the definite intention that they be carried at once to the customer; (2) goods obtained by the wholesaler or distributor to meet the needs of specified customers pursuant to an "understanding," contractual or otherwise, although not for immediate delivery; and (3) goods based on anticipation of customer need, rather than upon prior orders or contract.  *Jacksonville Paper*, 317 U.S. at 568-69.  The Court held that the goods in the first two categories remain in interstate commerce until the time they are delivered to retail customers, while goods in the third category could be held to remain in interstate commerce only when there is a "particularity" of evidence relating to a product and a customer, as opposed to "goods acquired and held by a local merchant for local disposition" to the general public.  *Id*. at 570.

[26]Plaintiffs assert that Digital Dish technicians do not deliver goods in interstate commerce.  Plaintiffs explain,

> The role of technicians is that of technicians, not that of delivery drivers who drop off [sic] packages at customers' homes.  Indeed, this characterization does not even suggest the correct lense [sic] through which the nature of DISH's business should be viewed.  DISH does provide physical products to their customers.  These products, however, are certainly no more than the main focus of DISH's business any more that [sic] the main focus of the telephone company is selling telephone cable.  DISH's real product, of course, is the Satellite TV programming which it beams to customers' homes.  The physical products which DISH provides are simply a means of facilitating the transfer to customers DISH's actual product, much as the phone company provides telephone lines to facilitate its real product, telephone service.  Without the signal beamed into it, the physical products provided by DISH network are just pieces of plastic.

Pls.' Opp. at 26.  There is no precedent to support Plaintiffs' sweeping assertions.  It is undisputed that technicians transport satellites and other equipment from Digital Dish warehouses to customers' homes, and, regardless of whether equipment is merely ancillary to the provision of satellite television, other courts have found that ancillary equipment may still be considered "fungible goods."  *See Opelika Royal Crown Bottling Co. v. Goldberg*, 299 F.2d 37 (5th Cir. 1962) (finding returnable refillable bottles transported by plaintiff drivers to be "goods in commerce"); *see also, Jones v. Centurion Inv. Assocs., Inc.*, 268 F. Supp. 2d 1004 (N.D. Ill. 2003) (rejecting plaintiffs' argument that the bread trays transported by plaintiff drivers and finding that the trays constituted "goods in commerce"); *Harrington*, 2005 U.S. Dist. LEXIS

of a particular shipment is the "original and persisting intention of the shippers." *Baltimore &*

*O.S.W.R.R. v. Settle*, 260 U.S. 166, 174 (1922); *see also Texas & N.O.R.R. v. Sabine Tram Co.*, 227

U.S. 111 (1913) (the time when a shipment of goods can be ascribed to interstate commerce is when

shipment begins its transportation for destination in another state).

### i. Whether MC-48 or MC-207 Applies

Though the parties agree that this Court's inquiry centers on the issue of whether Digital

Dish's deliveries and installation indicate a "practical continuity of movement" across state lines,

they disagree as to the proper test to apply to determine the "shipper's intent" at the time of

shipment.  Plaintiffs assert that the Court should use the test developed by the ICC in 1957; whereas,

Defendants advocate the use of an alternate test developed by the ICC in 1992.

In 1957, the ICC formulated a three-prong test to aid in the determination of a shipper's

"fixed and persisting intent at the time of shipment," where "the transportation was confined to

points in a single State from a storage terminal of commodities which have had a prior movement

by rail, pipeline, motor, or water from an origin in a different state."  29 C.F.R. § 782.7 (citing Ex

Parte No. MC-48 (71 M.C.C. 17, 29) (hereinafter, "MC-48")).[27]  This test, which is also set forth in

29 C.F.R. 782.7(b)(2),[28] provides that:

_____

12781, at *14 (rejecting plaintiff's argument that defendant employer was not a "motor private
carrier" because the tools and spare parts he carried in his van were not the "primary purpose of
his travel, but ancillary to the more vital purpose of transporting Harrington himself to the
customer site.").

[27]"While [MC-48] deals with petroleum and petroleum products, the decision indicates
that the same reasoning applies to general commodities moving interstate into a warehouse for
distribution (71 M.C.C. at 27). Accordingly, employees engaged in such transportation are not
subject to the Motor Carrier Act and therefore not within the section 13(b)(1) exemption." *See* 29
C.F.R. § 782.7.

[28]29 C.F.R. 782.7(b)(2) is an FLSA regulation.

> There is no fixed and persisting intent [to ship via interstate commerce] where: (i) At the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond the terminal storage, and (ii) the terminal storage is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated, and (iii) transportation in the furtherance of this distribution within the single State is specifically arranged only after sale or allocation from storage.

29 C.F.R. § 782.7(b)(2).[29]

In *Baird v. Wagoner Transp. Co.*, the Sixth Circuit adopted the ICC's 1957 test. 425 F.2d 407, 409 (6th Cir. 1970). In *Baird*, the defendant, Standard Oil, shipped petroleum products from out-of-state to a terminal in Muskegon, Michigan, based upon its "sophisticated" forecasts of the needs of its Michigan customers. *Id.* at 409, 411. Customers placed their orders with Standard's sales department either through requirements contracts or through regular or occasional individual orders. *Id.* These orders informed the terminal's manager and the shipper of the quantities and destinations of upcoming deliveries. *Id.* Although Standard knew the identities of its Michigan customers, it did not know the exact amount of petroleum products each customer would order when it shipped its products to the Muskegon terminal. *Id.* at 411. Using the ICC's three-part test, the Sixth Circuit found that because (1) the final delivery arrangements were not made until after the product had been stored at the terminal, (2) the forecasts were mere estimates, not specific orders, and (3) the terminal's "through-put rate"[30] was only six times its capacity, the terminal where the

---

[29]The language of MC-48, which includes an "and" between the three prongs, suggests a conjunctive test, pursuant to which all three prongs must be satisfied before the Court can conclude whether goods are transported *inter*state or *intra*state.

[30]"In business management, *through-put* is the rate at which a system produces money, in contrast to output, which may be sold or stored in a warehouse. The signal provided by throughput is received (or not) at the point of sale." *See* Wikipedia.com, "Throughput (business)," available at http://en.wikipedia.org/wiki/Throughput_%28business%29 (last viewed Aug. 29, 2006).

products were shipped was essentially a "local marketing facility," suggesting that the petroleum was *not* being transported in interstate commerce. *Id*.

In subsequent years, a number of courts determined that other factors were relevant to the determination of whether there is a fixed and persisting intent to ship products in interstate commerce, including:

> the length of time movement of the product is interrupted by storage; whether the product distribution center has a low 'through-put' compared to its storage capability; whether the products are shipped on a 'predetermined' ordering cycle; whether the carrier is in continuous possession of the product until delivery; whether the product is processed or commingled in any way at the storage location; whether the final destination is designated by the out-of-state shipper or by an instate intermediator; whether the goods were intended for particular customers; and whether temporary storage simply provides an efficient opportunity to convert the means of delivery from one form of transportation to another.

*See Foxworthy*, 997 F.2d at 672-73 (citing *Middlewest Motor Freight Bureau v. I.C.C.*, 867 F.2d 458 (8th Cir. 1988)); *Texas v. United States*, 866 F.2d 1546, 1556-57 (5th Cir. 1989); *Galbreath v. Gulf Oil Corp.*, 413 F.2d 941, 947 (5th Cir. 1969).

In 1990, the Fifth and Ninth Circuits noted that MC-48 has been "phased out," and the Eighth Circuit specifically declined to adopt it, deeming it "outmoded." *Roberts v. Levine*, 921 F.2d 804, 812 (8th Cir. 1990) (finding the test used in *Baird* "outmoded" and declining to adopt it); *California Trucking Ass'n v. I.C.C.*, 900 F.2d 208, 213 (9th Cir. 1990) ("Even though the ICC has never explicitly stated that it was abandoning the more structured [1957] test, it appears that its use of that standard has been refined, if not phased out."); *Central Freight v. I.C.C.*, 899 F.2d 413, 421 (5th Cir. 1990) (stating that ICC "appears to have implicitly recharacterized the applicable test"). These circuit courts approved the more recent test developed by the ICC in its 1986 decision, *Armstrong World, Inc. v. I.C.C. See* 2 I.C.C. 2d 63, 69 (1986). In *Armstrong*, the ICC broadened the relevant inquiry to determine whether a shipper intended to transport goods in interstate

commerce, explaining that:

> The determination of whether transportation between two points in [a] State is interstate (or foreign) or intrastate in nature depends on the "essential character" of the shipment. . . Crucial to this determination is the shipper's fixed and persisting intent at the time of shipment . . . [and] is ascertained from *all the facts and circumstances surrounding the transportation*.

*Id*.

Moreover, in a 1992 Policy Statement and a subsequent 1994 administrative decision involving the delivery of petroleum products, the ICC established detailed guidelines to determine the intent of the shipper from the facts and surrounding circumstances.  Policy Statement, No. MC-207, 8 I.C.C. 2d 470, 1992 MCC LEXIS 50 (Apr. 27, 1992) (hereinafter, "MC-207"); *Advantage Tank Lines, Inc., No. MC-C-30198,* 10 I.C.C. 2d 64 (Mar. 2, 1994).  The Policy Statement was derived from cases decided by the ICC, federal courts, and the Supreme Court, which explained the differences between intrastate and interstate trucking services provided within a single state.  The ICC outlined the following factors to "consider in establishing that the in-State for-hire transportation component is part of a continuing movement in interstate commerce."  *See* MC-207 at *4.  First, the ICC explained that interstate intent may be found where:

> Although the shipper does not know in advance the ultimate destination of specific shipments, it bases its determination of the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis, rather than a mere plan to solicit future sales within the State.  The factual basis for projecting customer demand may include, but is not limited to, historic sales in the State, actual present orders, relevant market surveys of need.

*Id*.  Additionally, the ICC stated that the following factors were also indicative of interstate intent: (1) "no processing or substantial modification of substance occurs at the warehouse or distribution facility"; (2) "while in the warehouse, the merchandise is subject to the shipper's control and direction as to the subsequent transportation"; (3) "modern systems allow tracking and

documentation of most, if not all, of the shipments coming in and going out of the warehouse or distribution center"; (4) "the shipper or consignees must bear the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier"; (5) "the warehouse utilized is owned by the shipper"; (6) "the shipments move through the warehouse pursuant to a storage in transit tariff provision." *Id*.

Most recently, on January 11, 2005, the DOL, upon consideration of a request for an opinion regarding certain intrastate delivery drivers, set forth factors to apply in determining whether the "fixed and persisting intent" of the shipper is that goods continue in interstate commerce when moving goods on a wholly intrastate leg of their journey, providing:

> 1. Even if a shipper does not know the ultimate destination of specific shipments, it bases its determination on the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis, rather than a mere plan to solicit future sales within the State.  This may include, but is not limited to, historical sales in the State, actual present orders, and relevant market surveys of need.

> 2. No processing or substantial product modification of substance occurs at the warehouse or distribution center.  However, repackaging or reconfiguring (secondary packaging) may be performed.

> 3. While in the warehouse, the merchandise is subject to the shipper's control and direction to the subsequent transportation.

> 4. Modern tracking systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse or distribution center.

> 5. The shipper or consignee must bear the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier.

> 6. The shipments move through the warehouse pursuant to a storage in transit provision.

*See* January 11, 2005 Opinion Letter, "Intra/interstate transportation of gasoline and section

13(b)(1)" FLSA2005-10 (citing 57 Fed. Reg. 19812, 19813 (May 8, 1992))[31]; *Advantage Tank Lines, Inc.*, No. MC-C-30198, 10 I.C.C. 2d 64 (1993); *Atlantic Indep. Union v. Sunoco*, 2004 WL 1368808, at *7 (E.D. Pa. June 16, 2004)).[32]

In their Motion, Plaintiffs argue that the Court should apply MC-48, while Defendant

_____

[31]January 11 Letter available at, http://www.dol.gov/esa/whd/opinion/FLSA/2005/2005_01_11_10_FLSA_IntraInterstate.htm (last viewed July 31, 2006).

[32]Additionally, the DOT explained that,

[T]he presence of one or more of the following factors is not sufficient to establish a break in the continuity that would change the interstate character of the subsequent transportation:

1. The shipper's lack of knowledge of the specific, ultimate destination or consignee at the time the shipment leaves its out-of-State origin;

2. Separate bills of lading for the inbound and outbound movements instead of through bills of lading;

3. Storage-in-transit tariff provisions;

4. Storage receipts issued by the warehouse distribution center;

5. Time limitations on storage;

6. Payment of transportation charges by the warehouse or distribution center, when the shipper or consignee is ultimately billed for these charges;

7. Routing of the outbound shipments by the warehouse or distribution center;

8. A change in carriers or transportation modes at a distribution facility;

9. Use of brokers retained by the shipper;

10. Use of a warehouse not owned by the shipper.

*See* 57 Fed. Reg. at 19813.

advocates for the application of MC-207.[33]  Plaintiffs assert that *Baird* remains good law in the Sixth

Circuit, and is, therefore, entitled to deference by this Court.[34]  *See* 425 F.2d at 412.  Defendant

counters that though MC-48 has never been expressly overruled, other courts have deemed MC-48

outdated.  *See, e.g., Atlantic Indep. Union*, 2004 U.S. Dist. LEXIS 11223, at *19-23; *Billings*, 2006

U.S. Dist. LEXIS 4698, at *10.  The *Atlantic Indep. Union* court explained:

> Many reasons compel the application of the more recent test delineated by the ICC.  First
> and foremost, the determination regarding whether the commerce at issue is interstate or
> intrastate has always been determined by a totality of the circumstances.  Moreover, since
> its inception, many courts, including the *Baird* court that first adopted [MC-48], have treated
> the test merely as a starting point from which to look at the totality of circumstances and
> have looked to factors outside the three-part test in order to determine a shipper's intent.
> Additionally, before the ICC revised its older test, three circuit courts noted that the 1957
> test was outmoded.  Finally the ICC is now using the flexible multi-factor test in its own
> decision.

*See id.*, at *21-22 (internal citations omitted).

Since its decision in *Baird*, the Sixth Circuit has not had occasion to revisit whether to apply

MC-48 or MC-207 in determining a shipper's intent.  Recently, however, a court *within* the Sixth

Circuit considered the issue.  *See Ballou*, 2006 WL 2035729, at *11.  The *Ballou* court considered

whether  defendant  DET's  beer  distribution  business  qualified  as  interstate  commerce  when

_____

[33]Plaintiffs also assert that MC-207 should not be applied in lieu of MC-48 because "by
its very language, [it] seems to be instituting a new test for *for-hire* motor transportation only."
Defendants counter that "there is no authority for Plaintiffs' position," and that "the test has not
been used this way in practice," with other courts using the "newer test" to evaluate the status of
"motor private carriers."  *See, e.g. Billings*, 2006 U.S. Dist. LEXIS 4698, at *11.  Plaintiffs have
pointed to no authority in support of its proposition that MC-207 was intended to regulate *only*
"motor carriers," and the Court finds their argument to be without merit.

[34]The Court notes that the DOL and DOT opinion letters adopting MC-207 (or something
similar), do not warrant significant judicial deference.  *See Christensen v. Harris County,* 529
U.S. 576, 587 (2000) ( "[i]nterpretations such as those in opinion letters. . . do not warrant
*Chevron*- style deference."); *see also Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)
(opinion letters are entitled to respect but only to the extent that they have the power to
persuade).

-28-

plaintiffs, various DET distributors, traveled only within Tennessee state lines.  *Id*. at *1.  Though

the *Ballou* court adhered to *Baird* in adopting MC-48, in a lengthy footnote, it supplemented MC-48

with four of the seven factors set forth in MC-207.  *See id*. at *11, n.4.  The *Ballou* court stated:

> The Court notes that in 1992, the ICC listed several factors in analyzing whether goods
> remain in interstate commerce beyond the terminal storage point.  Those DOT factors
> include: (1) Whether the goods are ordered based on projections of customer demand that
> have some factual basis, including without limitation, historical sales, actual present orders,
> and relevant market surveys of need. (2) Whether the goods undergo processing or
> substantial product modification of substance while at the warehouse or distribution center,
> but repackaging or reconfiguring (secondary packaging) may be performed.  (3) Whether
> while in the warehouse, the merchandise is subject to the shipper's control and direction to
> the subsequent transportation.  (4) Whether modern tracking systems allow tracking and
> documentation of most, if not all, of the shipments coming in and going out of the warehouse
> or distribution center.

*Id*. (internal citations omitted).

In harmony with the court in *Ballou*, this Court finds that in the face of modern

advancements and new shipping techniques, MC-48 is not longer sufficient to determine a shipper's

intent accurately.  Digital Dish's shipping system is more similar to those modern systems at issue

in the recent cases adopting MC-207 than the 1957 petroleum shipping system at issue in *Baird*.

Accordingly, although this Court does not repudiate the rule in *Baird*, this Court finds *Baird*

factually inapposite.  Thus, in harmony with courts from other circuits and the ICC itself in

*Armstrong*, this Court will apply MC-207 to determine whether Digital Dish ships goods in

interstate commerce.

### ii.  Application of MC-207

As set forth above, MC-207 includes seven factors to use in determining whether the "fixed

and persisting" intent of a shipper is that goods continue in *interstate* commerce when moving goods

on a wholly *intrastate* leg of their journey, and by extension, whether the intrastate journey may be

considered interstate in character. *See* MC-207. The Court recognizes that no particular factor is, in and of itself, determinative and notes that the Court's analysis should be based upon the practical realities of the transportation at issue. *See Northwest Terminal Elevator Ass'n. v. Minnesota Pub. Util. Comm'n.*, 576 F. Supp. 22, 25 (D. Minn. 1983). With this in mind, the Court will consider each of the seven factors with regards to the facts at issue.

### 1) Determination of the Total Volume to be Shipped

The Court must first consider whether the method DISH Network uses to determine the total volume of equipment to ship to Digital Dish each day is evidence that when DISH Network ships its equipment to Digital Dish, the company intends that equipment to continue in interstate commerce until it arrives at the homes of Ohio customers. Defendant asserts that DISH Network's intent to ship equipment in interstate commerce is clear because the "credit system" it uses to determine the amount of equipment to ship to Digital Dish accurately projects customer demand to maintain a quick turn-around time. In other words, according to Defendant, because the "credit system" employed by DISH Network allows the company to ship specific types and models of equipment to Digital Dish warehouses in accordance with customer demand, DISH Network equipment moves from DISH Network facilities to Ohio customers quickly – on average, in fewer than ten days. Plaintiffs counter that DISH Network's intent is not clear from its "credit system." They assert that the DISH Network equipment to be installed in customer homes is "diverted and allocated several times *after* it has left interstate commerce, going through several warehouses in *intrastate* commerce, and by all accounts [is] not linked with a specific customer until" it has been successfully installed.[35] Further, Plaintiffs claim that the ultimate destination of DISH Network

---

[35] In his affidavit, Digital Dish's Director of Human Resources, Richard Schneider, noted that roughly 5% of a technician's installations involve DISH Network's products that have been

equipment is actually determined by the technicians who install that equipment, not by DISH Network.

This case is distinguishable from similar cases in which the shipper transports products that have been set aside for a specific customer. *See Klitzke v. Steiner Corp.*, 110 F.3d 1465 (9th Cir. 1997) (local delivery driver for linen service that ordered roughly half of the materials it supplied from out-of-state suppliers, based on specific customers' orders delivered goods in interstate commerce); *Badgett v. Rent-Way, Inc.*, 350 F. Supp. 2d 642 (W.D. Pa. 2004)[36] (plaintiff was covered by the MCA exemption when the items shipped by defendant distributor to local warehouses were already earmarked for specific customers); *Hutson v. Rent-A-Center, Inc.*, 209 F. Supp. 2d 1353 (M.D. Ga. 2001) (products delivered both in-state and out-of-state were shipped by vendors pursuant to specific customer orders). Though Defendant contends that its system is rooted in a calculation

_____

assigned to a specific customer *before* they are shipped to Digital Dish. *See* Schneider Aff. ¶ 14. Schneider explained:

> Although the technicians generally pull stock from the shipments to warehouses in a manner calculated to meet current customer needs, they do not designate specific products for specific customers identified by name until after they arrive at the warehouse. They are occasionally called upon to install products that a customer special-ordered from DISH Network. These are mostly big-ticket items like special television monitors, satellite dishes or new receivers. Such direct orders account for roughly 5% of a technician's total installations. In these cases, the receiver box, or other specialty equipment shipped directly by DISH Network to Digital Dish has already been assigned to a particular customer before shipment.

*Id*. Because these orders account for such a small percentage of DISH Network's daily shipments to Digital Dish, this Court has not considered them in its analysis of whether Digital Dish transports DISH Network equipment in interstate commerce.

[36]The *Badgett* court applied MC-48 in conducting its analysis. *See* 350 F. Supp. 2d at 648 (citing MC-48). Though this Court has chosen to apply the more widely accepted MC-207 test, *Badgett* is still a good example of a case in which a shipper distributed goods pursuant to individual customer orders rather than projected customer needs.

of present customer need, it is based on estimates of customers' needs.  When DISH Network ships its equipment to Digital Dish warehouses in Ohio, the equipment is not sent with a specific customer in mind.  Though DISH Network know that the equipment will be going to one of Digital Dish's Ohio warehouses, beyond that, the equipment's final destination in Ohio is unknown.   In fact, the equipment's destination is unknown even after the equipment has been pulled for installation by a technician.  It is only after that equipment has been successfully installed in a customer's home and activated by DISH Network that it has come to rest.

Despite the fact that DISH Network may not know exactly which of its customers is set to receive each item it ships to Digital Dish, the Supreme Court has ruled that the MCA exception can still apply where goods are shipped based on an *anticipation* or *understanding of* the needs of specific customers.  *See Morris v. McComb*, 332 U.S. 422, 431-32 (1947); *see also, Jacksonville Paper*, 317 U.S. 570 (leaving open the possibility that shipments purchased in anticipation of the needs of certain customers might remain in interstate commerce when delivered in-state, observing that "a wholesaler's course of business based on anticipation of needs of specific customers, rather than on prior orders or contracts," might "at times be sufficient to establish that practical continuity in transit necessary to keep a movement of goods 'in commerce.'").  Thus, DISH Network's "credit system," which allows DISH Network to estimate the present need of customers based on the service needs of its customers may be sufficient to establish that the company intends to ship equipment in interstate commerce.

Defendant's "credit system" is similar to those at issue in *Talton v. Caffey Distrib. Co., Inc,* 124 Fed. Appx. 760 (4th Cir. 2005) and *Guyton v. The Schwan Food Co.*, 2004 U.S. Dist. LEXIS 4174 (D. Minn. Mar. 16, 2004), both cases in which courts have found that defendants' systems of

estimated customer need were sufficient to establish their intent to ship goods in interstate commerce.

In *Talton,* plaintiff was a former delivery route driver for a malt beverage and wine wholesaler/distributor, licensed by the state as the exclusive distributor of certain brewer's products in a number of North Carolina counties.  *Id.* at 761-62.  The defendant received its beer from various manufacturers inside and outside North Carolina, as well as from outside the United States.  *Id.*  The beer was delivered from the brewer to the defendant distributor's warehouse, and was then sold and distributed to retailers.  *Id.*  In order to determine how much product a retailer would need on an upcoming delivery, defendant's sales representatives would estimate that retailer's product needs by talking to retailer managers, and/or analyzing sales data, specifically, a retailer's current inventory and sales history.  *Id.* at 762.  The Fourth Circuit concluded that the goods were delivered in interstate commerce, in relevant part because, "the licensed retailers had an 'understanding' with [defendant] that [defendant] was required to provide them with enough beer to meet their sales needs."  *Id.* at 766.  The court explained, "Talton's contention that the products that he carried could not remain in interstate commerce because they were not specifically ordered by [defendant's] customers contravenes *Jacksonville Paper* itself.  There, the Supreme Court recognized that goods could be ordered pursuant to an 'understanding,' though not part of a specific order.'"  *Id.* at 765.  Thus, though no one case or keg of beer was earmarked for a certain retailer upon distribution, defendant's understanding with the retailers that it would supply it with its necessary inventory was sufficient to establish that the beer was intended for shipment in interstate commerce.  *Id.* at 765-66.[37]

---

[37]The *Talton* court also found that, pursuant to *Jacksonville Paper*, defendant's understanding with the various retailers meant that the temporary stoppage of the beer at

In *Guyton*, the court considered whether plaintiffs, former sales managers for defendant, the nation's largest home delivery frozen food company, delivered goods in interstate commerce, thereby qualifying for the MCA exemption.  *See* 2004 U.S. Dist. LEXIS, at *11-18.  Defendant shipped its products in caselots to one of its four U.S. distribution centers, from where the caselots were then shipped to one of defendant's depots via long-haul, over-the-road trucks.  *See id*. at *3-4.  Once the food products reached a depot, the caselots were unloaded and broken down into smaller individual sales unit within one to three days, and stored for less than ten days, at which point they were delivered to Schwan's customers.  *Id*. at *4.  Defendant based the amount of food product it shipped from the distribution centers to the depots on "standing customer orders, historic buying patterns, . . . predicted sales to targeted residential customers," and/or internet sales.  *Id*. at *4-5.  Defendant also uploaded the data from each sales order into a central database "that analyze[d] past sales to predict future sales with 95% accuracy."  *Id*. at *5.  Relying on the Eighth Circuit's decision in *Roberts v. Levine*, the *Guyton* court found that because the food items were transported to storage facilities on a temporary basis and then distributed in-state based on customer orders, though the goods had not been consigned to any specific customer at the time of shipment, the goods were transported in interstate commerce.  *See id*. at *14 (citing *Roberts*, 921 F.2d at 812-13 (where defendant controlled the purchase, shipment and sale of the goods, although the goods were not intended for shipment to a specific customer at the time of shipping, defendant evidenced a "fixed and persisting intent" to transport the goods in interstate commerce)).

Just as defendants in *Talton* and *Guyton* shipped products based upon estimated customer

---

defendant's warehouse was not sufficient to end its interstate journey.  *See* 124 Fed. Appx. at 764-65.  The court explained that because the products delivered by plaintiff were ordered by defendant to meet the needs of its customers, plaintiff transported the goods in interstate commerce.  *Id*. at 765.

need, in this case, DISH Network ships equipment to Digital Dish warehouses based upon projections derived from its "credit system," rather than upon specific customer orders. Though Plaintiffs assert that DISH Network's system is not accurate enough to establish the DISH Network's intent to ship its equipment in interstate commerce, the Court disagrees. One hundred percent accuracy is not required. It is enough that DISH Network tracks Digital Dish's needs, and distributes equipment to the the company accordingly. Moreover, it is notable that Defendant serves as DISH Network's Ohio RSP. Because of this RSP relationship, DISH Network has a vested interest in maintaining Digital Dish's inventory. Should DISH Network fail to supply Digital Dish with the product necessary to service its Ohio customers, DISH Network, not Digital Dish, would stand to lose profits.

Finally, in regards to Plaintiffs' argument that DISH Network does not intend to ship its equipment interstate because the technicians determine the ultimate destination of that equipment, this same argument was rejected by the court in *Billings*. *See* 2006 U.S. Dist. LEXIS 4698, at *12-13. In *Billings*, plaintiffs, regional service providers, for defendant, snack-food distributor, asserted that the fact that they had discretion over the final destination of a specific product was evidence that the product was not delivered in interstate commerce. *Id.* The *Billings* court disagreed, explaining that,

> [w]hile [plaintiffs] may have discretion when it comes to specific product delivery, they are granted that discretion by their employers and such discretion can be taken away at any time. This discretion is motivated by [defendant's] goal of maximizing profit. If [plaintiffs] can convince a retailer to accept more product, it is in [defendant's] best interest for the [plaintiffs] to have that flexibility. Additionally, the discretion of the [plaintiffs] is built into [defendant's] inventory control system. This is not a case in which the [plaintiffs] are independent contractors who purchase the product from [defendant] for resale to retailers. [Defendant] and its affiliated companies retain control over the product for its entire journey.

*Id.* Just as plaintiffs in *Billings* were granted discretion to distribute defendant's products on

defendant's terms, in this case, the fact that Digital Dish technicians make the final decision about what specific piece of DISH Network equipment goes to what customer is merely ancillary to their position as a DISH Network affiliate.  Technicians never have title to or authority over the DISH Network equipment, and their daily tasks are assigned to them by Defendant.  Accordingly, Plaintiffs' argument that technicians decide each piece of equipment's final destination does not negate this Court's conclusion that DISH Network intends that its goods be shipped within interstate commerce.

### 2) Processing or Substantial Product Modification

A product is more likely to be considered shipped in interstate commerce if, "[n]o processing or substantial product modification of [that product] occurs at the warehouse or distribution center.  However, repackaging or reconfiguring (secondary packaging) may be performed."  *See* MC-207.  Plaintiffs suggest that technicians substantially modified the DISH Network equipment before setting out to deliver it to Digital Dish customers.  They assert that because they assemble many of the dishes ahead of time and download the software to activate those dishes before installing them in customers' homes, they substantially modify the DISH Network equipment before passing it onto customers.  Defendant, however, argues that these minor equipment modifications do not rise to the level of the processing that may create a discontinuity in interstate commerce.

Though it is not a MCA exemption case, *Roberts v. Levine* provides a helpful discussion of what constitutes "substantial modification."  *See* 921 F.2d 804, 814 (8th Cir. 1990) (plaintiff appealed the district court's order declaring that he transported goods intrastate without a state permit).  In *Roberts*, the court considered whether plaintiff's intrastate transport of goods was

merely one part of an interstate journey governed by the motor carrier provisions of the Interstate

Commerce Act, 49 U.S.C. §§ 10101-11913 (1988), which preempts state jurisdiction. *Id*. at 805.

Defendant regularly transported shipments of soybeans from his employer, the Sleepy Eye

Elevator, to an in-state soybean processing plant, where it was then processed and/or refined into

different types of soybean oil before being sold. *Id*. at 809. Plaintiff asserted that the district

court erred in holding that his transportation of soybeans was not merely the first leg of a journey

in interstate commerce. *Id*. at 815.

Before conducting a thorough analysis of the facts, the *Roberts* court noted that

"manufacture of an item interrupts the stream of commerce so that after manufacture, there is a

*new* commercial journey, either inter- or intrastate." *See* 921 F.2d at 815 (citing *Crescent Cotton

Oil Co. v. Mississippi*, 257 U.S. 129 (1921) (finding that the separation of the seed from the fiber

of cotton by means of a cotton gin constituted "manufacturing"); *Arkadelphia Milling Co. v. St.

Louis S.W. Ry.*, 249 U.S. 134 (1919) (holding that the movement of rough lumber from the forest

to a mill, where it was made into barrel hoops and staves, was not interstate commerce because

there was "no continuous movement from the forest to the points" out of state, and because when

the rough material left the woods "it was not intended that it should be transported" beyond the

mill until it had been subjected to a manufacturing process); *Utah-Idaho Sugar Co. v. Fed. Trade

Comm'n*, 22 F.2d 122, 125 (8th Cir. 1927) (stating that "there is no [interstate] commerce to

obstruct until [after manufacturing takes place]")). Accordingly, the *Roberts* court found that

plaintiff was not transporting soybeans in interstate commerce because the processed soybeans

and refined soybean oil which he transported interstate commerce was a *new* commodity which

was materially different in "character, utility and value" from the *raw* soybeans he had

transported to the elevator.  *Id*. at 816.[38]

Additionally, the DOL Wage and Hour Division Field Operations Handbook states that a modification that does not change the nature of the product is insufficient to create a break in that product's interstate journey.  *See* DOL Field Operations Handbook at § 24c02, 24d00.  The handbook sets forth the following examples of processing or modification that would *not affect* the interstate movement of goods:

> (1) Coal being shipped to an out-of-State buyer is hauled to a tipples where, in a continuous operation, it is unloaded from the truck and cleaned, crushed, or graded and loaded directly into railroad cars for shipment out-of-State; or
> (2) Household goods are transported by truck drivers from a home to a warehouse to be crated or packed so that the movement by motor vehicle to the intended out-of-State destination may be continued.

*Id*.

Plaintiffs assert that they substantially modify DISH Network equipment before they install it in customers' homes.  They argue that they had to spend at least fifteen to twenty minutes pre-downloading receivers with updated DISH Network software, and assembling certain dishes.  In his deposition testimony, Musarra asserts that many of the DISH Network dish's came in multiple pieces, and took more than 45 minutes to assemble.  *See* Musarra Dep. At 58:7-61:17.[39]  Further, Musarra testified that if the technicians did *not* assemble the "Super

---

[38]The *Roberts* court also noted that though Roberts had asserted that soybean oil and meal are not "manufactured," his claim was belied by an ICC regulation listing soybean oil and soybean meal as "manufactured commodities."  *See* 921 F.2d at 816 (citing 49 C.F.R. § 1047.25 (1989)).

[39]For instance, in describing the assembly required for a DISH Network "Super Dish," Musarra stated:

> A Super Dish itself probably came in like almost 120 pieces, and then with the bolts and stuff, almost like 15 to 30. . . . So I'd be sitting there, and a lot of us would, unpacking the Super Dishes. . . So it took me an extra 45 minutes to an hour to make my dishes.

Dishes" ahead of time, they would simply not fit in the technician's truck.  *Id*. at 58:14-15.

This Court finds that Plaintiffs' modifications to DISH Network products do not rise to the level of the substantial processing that could interrupt a shipper's intent to move goods in interstate commerce.  Although Plaintiffs may spend time removing DISH Network products from their boxes and assembling the parts before transporting the products to customer homes, such changes are merely incidental to technicians' job of transporting and installing DISH Network equipment on for Digital Dish customers.  *See Anheuser-Busch Brewing Ass'n v. United States*, 207 U.S. 556, 562 (1907) (finding that plaintiff's cleaning, drying, soaking in chemicals, and then re-drying of a cork to seal beer bottles was not manufacture because, "[m]anufacture implies a change, but every change is not manufacture. . . There must be transformation; a new name and different article must emerge. . . .").  After the assembly by Digital Dish technicians, a DISH Network Super Dish was still a DISH Network Super Dish; it was merely one step closer to being ready for installation.

### 3) Goods Under Substantial Control and Direction of the Shipper

Next, the Court must consider whether, "[w]hile in the warehouse, the merchandise is subject to the shipper's control and direction to the subsequent transportation."  *See* MC-207.  It is undisputed that DISH Network has procedures in place to insure that DISH Network maintains absolute control "over the ownership and ultimate fate of its equipment."  *See* Def's. Motion at 27.  DISH Network ships its products to Digital Dish on consignment, and maintains title to the

_____

After making them, they would fit in the truck. . . Each pole needed to be modified. . . 34 switches came inside the kit.  They had to be modified, unpackaged, and you actually had to put bushings on each 34 switch to seal them.

*See* Musarra Dep. at 60:11-61:17.

equipment up until it has been successfully installed in customer homes.  Accordingly, even if the equipment is in storage at a Digital Dish warehouse, or in a technician's truck, Digital Dish is only a bailee.  Further, Digital Dish has no power to change the formula through which DISH Network determines how much product must be shipped, and DISH Network requires Digital Dish to keep its equipment moving through the Digital Dish warehouses quickly, within a maximum of ten days, and usually in as few as three to four days.[40]

Finally, as evidenced by the DISH Network Installation Handbook, which is provided to Digital Dish and its technicians, Digital Dish and its employees are intended to be a conduit for DISH Network equipment.  The Handbook provides:

> Once the customer chooses to buy [DISH Network] products and services, we must promptly send a representative to the customer's residence to perform the installation.  As the installer, you are the vital link between the customer and the system.  In fact, to the new customer, YOU ARE DISH NETWORK.
> The installation is often the customer's only opportunity to deal "face to face" with DISH Network. . . .
> *Always remember that YOU ARE DISH NETWORK! . . .*

*See* Schneider Aff. ¶ 18, Ex. C.  Thus, not only does DISH Network intend that Digital Dish employees install its equipment, but also, according to the Handbook, DISH Network intends that Digital Dish employees represent their parent company.  DISH Network relies on Digital Dish as its Ohio RSP, but it is DISH Network who has true control over its business practices and, by extension, its equipment.

_____

[40]Plaintiffs assert that Digital Dish maintains control over the goods in that the company put its own bar codes on and rescanned DISH Network's products for its own purposes.  *See* Musarra Dep. at 57:18-22 ("You stack it the same, put their scanning things on.  It they have a little computer.  It scannerizes it.  They type my tech number in.  It lists what equipment I take.").  Digital Dish's barcodes, do not detract from the fact that DISH Network maintains tight control over its equipment.  They are merely evidence that Digital Dish has developed its own tracking system to off-set that of DISH Network.

**4) Tracking Systems**

The Court must also consider whether "[m]odern tracking systems allow tracking and documentation of most, if not all, of the shipments coming and going out of the warehouse or distribution center." *See* MC-207.  Defendant asserts that its tracking system clearly rises to the level of the sophisticated system, which suggests interstate commerce.  The Court agrees.

Modern tracking systems are a common feature of systems designed to deliver interstate goods through a final intrastate leg.  *See Talton v. Caffey Distributing Co., Inc.*, 2004 U.S. Dist. LEXIS 6894, at *20-21 (D.N.C. Mar. 11, 2004) (defendant ordered beer for delivery to customers by tracking previous orders and forecasting future customer demand); *Billings*, 2006 U.S. Dist. LEXIS 4698, at *2-3 (plaintiffs, Frito-Lay route sales representatives, "record their pick-ups and deliveries using a handheld electronic wand device," and transmit any collected information to Frito-Lay's inventory control system, which subsequently forecasts its distribution centers' estimated product needs); *Atlantic Indep. Union*, 2004 U.S. Dist. LEXIS, at *23-24 (finding that defendant demonstrated a fixed and persisting intent to ship its product interstate based in part on the fact that defendant determines how much product to ship and when to ship it based on customer demand projections, "taking into consideration historical need and anticipated weather conditions, rather than solicitation of future sales"); *Bilyou v. Dutchess Beer Distrib., Inc.*, 300 F.3d 217, 219 (2d Cir. 2002) (distributor's main office in Missouri was connected by an electronic communication system to defendant's New York facility, enabling distributor to monitor daily the amount and distribution of its products delivered to defendants' customers); *Guyton*, 2004 U.S. Dist. LEXIS 4174, at *5 ("In order to produce and ship the optimal amount of products to the depots, each sales order is entered into a hand-held computer

-41-

by a route manager," and the data from the computers is the uploaded to a central database,

which analyzes past sales to predict future sales).

DISH Network employs a complex tracking system similar to those at issue in the above

cases.  All DISH Network products are serialized with stickers present on the outside of the

product's box, and upon arriving at the Digital Dish warehouse, these numbers are scanned into

the joint DISH Network/Digital Dish tracking system.  Schneider Aff. ¶ 24.  The serial number

informs DISH Network of when particular equipment is installed and activated.  Schneider Aff. ¶

24.  When a technician has successfully installed the equipment in a customer's home, his next

step is to call DISH Network to tell the company the serial number of the equipment so that

DISH Network can then perform the necessary steps to activate it.  *Id*.   Further, those serialized

numbers allow DISH Network to determine whether Digital Dish has retained DISH Network

equipment in the Digital Dish warehouse, or whether it has timely passed them onto customers.

The sophisticated nature of the DISH Network tracking system and the requirement that Digital

Dish turnover DISH Network product in less than ten days suggests that DISH Network intends

to ship its equipment in interstate commerce.

### 5) Bearing Costs of the Ultimate Payment for Transportation Charges

If "[t]he shipper or consignee must bear the ultimate payment for transportation charges even

if the warehouse or distribution center directly pays the transportation charges to the carrier," the

shipment will more likely be considered to be interstate.  It is undisputed that DISH Network bears

the transportation costs for all products delivered from its out-of-state facilities to Digital Dish

warehouses.  *See* Anderson Aff. ¶¶ 2-13.[41]  From the evidence presented, however, it appears that

_____

[41]Anderson testified:

Digital Dish, not DISH Network, bears the costs of transporting DISH Network goods within the state of Ohio.  Digital Dish supplies most of its technicians with trucks and/or vans and pays for those vans itself.  Digital Dish pays the salaries of its technicians and other employees. Accordingly, this factor weighs in favor of neither party.

### 6) Warehouse Owned by the Shipper

A shipment is more likely to be considered interstate if the warehouse used is owned by the shipper. *See* MC-207.  In this case, however, Digital Dish, not DISH Network, owns the warehouses in Ohio. *See* Anderson Aff. ¶ 12; Schneider Aff. ¶ 13.[42]

### 7) Storage in Transit Provision

Finally, if shipments "move through the warehouse pursuant to a storage in transit provision," it suggests interstate commerce. *See* MC-207.  Based on the evidence presented, the parties do not appear to have a storage in transit provision.  Nonetheless, in *Merchants Fast Motor Lines, Inc. v. ICC*, the Fifth Circuit held that the inclusion of a storage in transit provision was "just *one of the many factors* that may bear" on the question of whether a shipper intended to transport its goods interstate.  5 F.3d 911, 918 (5th Cir. 1993).  The *Merchants* court explained:

> The ICC did not decide that the use of a storage-in-transit privilege was dispositive of the interstate nature of the movement.  The ICC noted that it was a "strong indication" of the

---

Digital Dish receives up to one or two tractor trailers of equipment from DISH Network's out-of-state facilities, shipped by freight, every day.  Customer payments for DISH Network goods are made directly to DISH Network. . . DISH Network pays Digital Dish for the services Digital Dish provides to DISH Network customers.

*See* Anderson Aff. ¶ 10.

[42]In 2002 and 2003, Digital Dish had warehouses throughout Ohio in Millersburg, Cleveland, Columbus, Jackson, Toledo, Dayton, Cincinnati, and Canton. *See* Anderson Aff. ¶ 13.

through character of the movement, but relied in addition on the "incidents" surrounding the involved transportation.  Without discussing them in detail, the ICC noted such indicia as the tracking and documentation linking the shipments coming in and going out of Arlington, and the fact that the goods are not processed, other than being cut to specification, at the temporary storage point.

*See id.* (citing *State of Texas v. United States*, 866 F.2d 1546, 1560-61 (5th Cir. 1989)).  As in *Merchants*, therefore, this Court notes that the fact that DISH Network did not include a storage in transit provision in its business agreement with Digital Dish does not establish that DISH Network did not intend to transport its equipment in interstate commerce.

### 8) Conclusion as to MC-207

As noted *supra*, no single factor in the MC-207 inquiry is determinative of whether a shipper transports its goods in *inter*state or *intra*state commerce.  As is apparent from the above analysis, however, the delivery methods employed by DISH Network and Digital Dish meet most of MC-207's seven criteria.  Accordingly, MC-207 suggests that Plaintiffs deliver and install DISH Network equipment in *inter*state commerce.

### iii. Whether the Goods that Digital Dish Returns are Transported in Interstate Commerce

Although MC-207 suggests that DISH Network intends to ship its equipment in interstate commerce, as a final consideration, this Court will analyze Defendant's assertions that  any returns of DISH Network receivers[43] initiated by customers and carried out by technicians occur in interstate commerce because they indicate Defendant's "fixed and persisting intent" to return the equipment

_____

[43]Whereas other DISH Network equipment, i.e. satellites, can be re-used for other customers, both parties agree that DISH Network receivers cannot be re-used.  *See* Def.'s Ex. B. ¶ 9 ("All removed equipment must be returned to the warehouse and *cannot be reused on another customer's home*"); *see also*, Schneider Dep. at 68:14-24 (". . . once DISH [Network] turns that box off of that satellite, it is of no use to anybody.  You can't go over here and turn it on at Jill's house or this lady's house with a different phone number.  It's a dead box.").

-44-

to DISH Network's out-of-state facilities.    According to Defendant, by regularly picking up receivers, and as part of their regular duties, returning them to Defendant's warehouses where they can be packed and shipped to DISH Network's out-of-state facilities, technicians are part of an "integrated commercial cycle."  Plaintiffs counter that Defendant incorrectly "lumps" all returns into a category of merchandise which is obtained by technicians at customer homes and subsequently shipped interstate when returns actually encompass a variety of different situations, including situations in which the returned equipment remains with the technician, or with Digital Dish. Further, Plaintiffs claim that because the technicians are not assigned a regular route through which they must carry out regular returns, and because such returns comprise such a small part of their daily tasks, their situation is easily distinguishable from the cases upon which Defendant relies.

The Court finds unpersuasive Plaintiffs' contentions that the returns do not indicate the continuous movement of DISH Network goods in interstate commerce because they comprise such a small part of technicians' daily duties.[44]  In *Badgett v. Rent-Way*, the court rejected a similar claim by plaintiffs.  *See* 350 F. Supp. 2d at 652.  In *Badgett*, plaintiffs attempted to minimize Rent-Way's

---

[44]In making their argument that returns occur with too little frequency to constitute interstate commerce, Plaintiffs rely on *Masson v. Ecolab, Inc.*, 2005 WL 2000133 (S.D.N.Y. Apr. 17, 2005).  In *Masson*, defendant, a company that marketed cleaning, sanitizing, pest control and other maintenance products/services, asserted that the plaintiff, a route manager for defendant, fell under the MCA exemption.  *Id*. at *1.  Plaintiff countered that the MCA exemption did not apply, in relevant part, because driving constituted such a small part of its daily activities.  *Id*. at *7-8.  The *Masson* court explained that "the exemption does not apply to an employees' entire term of employment if the 'continuing duties of the employee's job have no substantial direct effect on safety of operation or where such safety-affecting activities are so trivial, casual or insignificant as to be de minimis."  *Id*. at *6-7.  However, Plaintiffs neglect to consider the fact that the *Masson* court also found that "[t]he activities of one who drives in interstate commerce, however frequently or infrequently, are not trivial. . ." and courts must employ a fact-specific analysis to determine the "character of interstate commerce."  *Id*. at *8. Thus, it is not the number of equipment returns, but whether those returns can be characterized as interstate commerce that matters.

involvement in interstate commerce by asserting that the retrieval of merchandise from other out-of-state Rent-Way stores was a "rare event," occurring for less than one delivery out of one hundred and twenty in a good sales month. *See id*. The court held the number of retrievals was unimportant, explaining that "[t]he MCA does not limit motor private carriers to those who ship large amounts of property or ship property as their principal business; it merely requires that they transport property 'to further a commercial enterprise.'" *Id*. Similarly, regardless of whether such returns comprise a large part of Defendant's business, it is the *character* of these returns that matters, not the frequency with which they occur. *See Levinson v. Spector Motor Serv.*, 330 U.S. 649, 658 (1947) ("It is the character of the activities rather than the proportion of either the employee's time or his activities that determines the actual need for the Commission's power to establish reasonable requirements. . . ."). Accordingly, in considering the parties' arguments, the Court must focus on the *character* rather than the volume of any returns.

There are a number of cases from other circuits in which courts determined that drivers' returns were part of an "integrated commercial cycle." *See Opelika*, 299 F.2d at 37 (empty cola bottles shipped to out of state bottler four to six times per week pursuant to a pre-existing agreement constituted transportation in interstate commerce); *Thomas v. Wichita Coca-Cola Bottling* Co., 968 F.2d 1022 (10th Cir. 1992) (empty soda containers held by customers, picked up by route drivers and returned to an out of state bottling facility on a daily basis); *Foxworthy*, 997 F.2d at 670 (route drivers' daily return of milk crates were an indispensable part of milk processing procedures at the out-of-state dairy plant); *Bilyou*, 300 F.3d at 217 (where employer had a fixed and persisting intent to return the empties to an out-of-state location, daily pick-up by route drivers of a beer distributor of aluminum cans, bottles, and refillable containers for out-of-state shipment constituted interstate

-46-

commerce); *Jones,* 268 F. Supp. 2d at 1004 (where employer had a fixed and persisting intent that bread trays picked up daily by route drivers be shipped out-of-state, route drivers' pick-ups constituted interstate commerce).

The underlying theory in those cases is that the intrastate initiation of an interstate journey may form the basis for the application of the MCA exemption where it can be considered part of an "integral commercial cycle."  Although Defendant asserts that the technicians carry out regular returns to DISH Network, performing the same essential tasks as the distributors in the foregoing cases, the Court disagrees.  In each of the above cases, the drivers regularly picked up and returned large numbers of empty containers, trays, and/or pallets knowing that the goods were headed to an in-state warehouse, and then on to an out-of-state distributor.  The pickups and deliveries were part of the drivers' regular daily routes, and in some cases, the out-of-state distributor needed the returned goods before they would distribute more products.  *See, e.g., Opelika*, 299 F.2d at 39 (an equivalent number of empty bottles had to be returned before any full bottles could be distributed).  In this case, however, when technicians make equipment returns, they do not do so with the specific intent that these returns are bound for DISH Network, and once they brought a return to the nearest Digital Dish warehouse, they generally have no further involvement with the returned equipment.  *See* Klug Dep. at 39:18-40:12; Musarra Dep. at 120:13-23.  In fact, Defendant's Exhibit B, an excerpt from DISH Network's Installation Manual, which describes Digital Dish's "RA[45] procedures," states that removed equipment must be returned to the warehouse, but does not indicate that all returned equipment will then be forwarded on to DISH Network.  *See* Def.'s Ex. B[46]

---

[45]DISH Network refers to equipment returns as "RA's."  *See* Schneider Aff. ¶ 11.

[46]The RA Procedures are as follows:

-47-

(indicating only that the equipment must be shipped back to the warehouse – in this case, Digital Dish's main Millersburg warehouse).  Moreover, the nature of the drivers' businesses in the above cases is distinguishable from that of Defendant.  Those businesses dealt with commodities, i.e. milk, beer, soda, and bread, while Digital Dish deals with equipment which is ancillary to its satellite TV service.  When the commodities were exhausted, the drivers were to return the empty containers to the distributor for refills.  In contrast, in this case, when customers return equipment, Digital Dish replaces it with new equipment to prevent interruption of DISH Network service to customers, and then *sometimes* returns the damaged equipment to DISH Network.  Some of that returned equipment

---

9. RA PROCEDURES:

- <u>Any piece of equipment that is defective or not and removed from a customer's home must have a Returned Merchandise Form completed.</u>
- All removed equipment must be returned to the warehouse and cannot be reused on another customer's home.
- Contact Dish Network to see if equipment is still under warranty or if customer has to purchase a new receiver from Technician.
- Notify Digital Dish Dispatch of all equipment removed from a customer's home and Digital Dish Dispatchers will complete RA request to Dish Network for bad equipment.
- Turn in completed Returned Merchandise Form with damaged equipment to Technical Supervisor within 7 days from date equipment removed from customer's home.
- The supervisor must sign off that same form verifying he received the piece of equipment.
- Supervisors are required to return damaged equipment and completed forms to the warehouse weekly.
- Attached Returned Merchandise Form to customer's work order that the damaged equipment was removed.
- Complete Service Agreement detailing equipment removed and equipment installed including model#, serial#, ROO#, SOO#, and make sure customer signs form.
- Every individual item of equipment removed from a customer's home must have a Returned Merchandise Form completed.  Techs cannot combine two items of equipment on a single Returned Merchandise Form.

*See* Def.'s Ex. B ¶ 9 ("RA Procedures").

-48-

may be fixed and/or re-manufactured for later use,[47] but it is not sent back "full," in the same way that the above distributors "filled" bottles, crates, and/or trays with new product for sale.

Finding the above "integral commercial cycle cases" inapposite, the Court deems the case sub judice more similar to *Packard v. Pittsburgh Transp. Co. See* 418 F.3d 246 (3d Cir. 2005) (drivers providing intrastate transportation to elderly and disabled persons pursuant to a federally-funded program did not constitute interstate commerce where drivers did not travel regular routes, did not know passengers' final destination, and were not part of an interstate "through-ticketing" arrangement). In *Packard*, the court considered whether drivers employed by the Pittsburgh Transportation Company's ACCESS transit service ("ACCESS drivers") fell under the MCA exemption. *See* 418 F.3d at 248. ACCESS drivers provided transportation to elderly and disabled people who were unable to use other forms of public transportation, including transportation to Pittsburgh-area Amtrak stations, Greyhound bus stops, and the airport. *Id*. at 248-49. ACCESS drivers did not have regular routes, or set daily schedules. *Id*. at 249. Instead, Pittsburgh Transportation scheduled drivers' routes each day to provide passengers with "the most efficient service possible." *Id*. Passengers had to purchase ACCESS tickets in advance, and such tickets were not linked to tickets for interstate travel on non-ACCESS transit services. *Id*.

Although defendant argued that ACCESS employees carried out their responsibilities in the context of a clearly integrated commercial cycle, the *Packard* court disagreed, finding instead that ACCESS employed a pattern of distribution "markedly unlike" those set forth in other cases. *See id*. at 254. The *Packard* court explained:

When we apply the "essential character of the movement" inquiry to the ACCESS drivers,

---

[47]Neither party has established exactly how much equipment is remanufactured by DISH Network for customer use.

it is clear that other cases applying the MCA exemption do not suggest the proper outcome here.  The ACCESS drivers are not integrated into their passengers' interstate travel to the degree in which many intrastate commercial drivers are integrated into the interstate movement of commercial goods.  Indeed, the ACCESS service lacks any legal or institutional connection to the interstate movement of passengers or goods.  Although the service's pick-up or drop-off point sometimes coincides in time and space with one endpoint of certain passengers' interstate journeys, there is no well established logical or logistical connection between the two. . . [Thus,] unlike the delivery drivers in the cases canvassed above, the ACCESS drivers are not part of a clearly-defined routine interstate commercial exchange controlled centrally by their employer.

*Id*. at 256-57.

In this case, like the drivers in *Packard*, Digital Dish technicians lack an institutional connection to the interstate movement of the goods.  Though they regularly complete equipment returns,[48] they are not responsible for what happens to the returns once they return them to the nearest Digital Dish warehouse.  Further the record suggests that no decision is made about what will happen to the equipment until it reaches the Millersburg warehouse.  *See* Def.'s Ex. B ¶ 9 ("supervisors are required to return damages equipment and completed forms to the warehouse weekly").  Further, although technicians make returns as a regular element of their trips to and from Digital Dish warehouses to various customers, they have seven days in which to complete their returns.  *See* Def.'s Ex. B ¶ 9 ("RA Procedures").  Therefore, once a technician removes certain DISH Network equipment from a customer's home, it could remain in his care for as many as seven days before its is returned to the nearest Digital Dish warehouse, let alone the Millersburg distribution center and/or DISH Network.  Thus, the Court finds that Defendant has failed to establish that technicians returning equipment to its in-state warehouses are carrying out the first leg of an interstate journey.

---

[48]Musarra contends that he had a month where he did not make a return, but he cannot remember what month that was.  Musarra Dep. at 120:7-10.

### iv. Conclusion

It is well-established that to determine whether the goods in question possess "a practical continuity of movement" from an out-of-state shipper to their ultimate in-state destination, the Court must consider whether the "essential character of the commerce, manifested by [the] shipper's fixed and persisting transportation intent at the time of shipment, as ascertained from *all* of the facts and circumstances surrounding the transportation," indicates that the shipper intended for the goods to reach an ultimate interstate goal. *See Klitzke*, 110 F.3d at 1465; *Bilyou*, 300 F.3d at 224, *Foxworthy*, 997 F.2d at 672. The above analysis applies regardless of whether a court adheres to MC-48 or MC-207. Considering the totality of the circumstances in this case, the Court finds that in making daily shipments of equipment to Digital Dish, DISH Network intends to ship its goods in interstate commerce. Accordingly, Digital Dish is a "motor private carrier" transporting goods in interstate commerce, and Plaintiffs fall under the MCA exemption. Plaintiffs' federal overtime compensation claims must, therefore, be dismissed.

### D. Plaintiffs' State Law Claims[49]

Plaintiffs have also brought identical state law claims, pursuant to OMFWSA. *See supra* Part II.B.

28 U.S.C. § 1367 provides that,

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case

---

[49]Although the parties' cross-motions were limited to the issue of the applicability of the MCA exemption, and did not deal with Plaintiffs' state law claims, because this Court has determined that Plaintiffs fall under that exemption, their federal claims must be dismissed, compelling this Court to consider whether it may exercise pendent jurisdiction over Plaintiffs' state law claims.

or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties. . .

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. . . .

28 U.S.C. § 1367. Pursuant to 28 U.S.C. § 1367, district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). "The general rule is that a district court should dismiss pendent state law claims if the federal claims have been dismissed before trial." *Taylor v. First of Am. Bank-Wayne,* 973 F.2d 1284, 1289 (6th Cir.1992) (citing *Gaff v. Fed. Deposit Ins. Corp.,* 814 F.2d 311, 319 (6th Cir.1987)); *see also Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343 350, n.7 (1988) (recognizing that, in such cases, the balance of interests will usually point toward declining to exercise jurisdiction). Moreover, when making such a determination, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.,* 994 F.2d 1178, 1182 (6th Cir.1993) (citing *Aschinger v. Columbus Showcase Co.,* 934 F .2d 1402, 1412 (6th Cir.1991)).

This Court has dismissed Plaintiffs' federal claims and finds no overwhelming issues of judicial economy which would weigh heavily towards exercising supplemental jurisdiction over Plaintiffs' pendent state law claims. Indeed, the parties' arguments regarding the application of the OMFWSA present sufficiently novel state law questions which would weigh *against* this Court's

exercise of jurisdiction.  For these reasons, this Court declines to exercise supplemental jurisdiction over Plaintiffs' OMFWSA claims, and the claims are dismissed without prejudice.

## V. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment and **GRANTS** Defendant's Motion  for Partial Summary Judgment.  This case is hereby dismissed.  Plaintiffs' state law claims are dismissed without prejudice so that Plaintiffs may pursue the claims in state court if they desire.

**IT IS SO ORDERED.**


    **s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: September 28, 2006**